Bardahl Manufacturing Corporation, et al. [1] v. Commissioner. Bardahl Mfg. Corp. v. Commissioner
Docket Nos. 73285-73288.
United States Tax Court
T.C. Memo 1960-223; 1960 Tax Ct. Memo LEXIS 66; 19 T.C.M. (CCH) 1245; T.C.M. (RIA) 60223; October 20, 1960
*66 1. Amount paid its president and principal stockholder by M corporation in 1955 held reasonable compensation for services rendered. 2. Amounts paid their vice president, a director and the wife of their principal stockholder, by M and I corporations in 1954 and 1955 held unreasonable compensation for services to the extent determined by respondent. 3. Depreciation and operating expenses of an automobile purchased by M corporation and driven for her personal use by its vice president held not ordinary and necessary expenses of M corporation. 4. M corporation paid its president and principal stockholder amounts for entertainment of business guests and for maintenance of a study in his home. Held, certain amounts of reimbursements for entertainment of business guests determined as deductible business expenses of M corporation; held, further, no amounts paid for home maintenance are deductible by M corporation as business expenses. 5. Held, fair rental value and operating expenses of automobile purchased and paid by corporation but devoted to personal use of its vice president, unsubstantiated amounts paid by M corporation to its president for entertainment of business guests, and amounts *67 paid by M corporation to its president for home maintenance, are includible in community income of president and vice president, husband and wife. Joseph H. Trethewey, Esq., and George D. Bender, C.P.A., Vance Bldg., Seattle, Wash., for the petitioners. Wilford H. Payne, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in income tax of petitioners for the taxable periods (calendar years, unless otherwise indicated), as follows: Dkt.
No.
Petitioner
Year
Deficiency
73285
Bardahl Manufacturing
Corporation
1954
$ 3,242.67
1955
21,097.43
73286
Inga Bardahl
1954
935.33
73287
Ole Bardahl
1954
935.34
73288
Bardahl International
Corporation
F/Y
ended
11-30-55
789.56
The following issues are presented for our consideration with respect to petitioner Bardahl Manufacturing Corporation: 1. Is taxpayer entitled to a deduction of the full amount of $75,000 for salary paid to Ole Bardahl, its president, for the year 1955 on the grounds that it was reasonable compensation for services rendered? 2. Is taxpayer entitled to a deduction of $3,000 for the year 1954 and to a deduction of $1,500 for the year 1955 for compensation paid to its vice president and director, *68 Inga Bardahl, on the grounds that it was reasonable compensation for services rendered? 3. Is taxpayer entitled to a deduction of $1,225.05 for the year 1954 and a similar deduction of $607.42 for the year 1955 for its contribution to its pension and profitsharing plan on behalf of Inga Bardahl, vice president and director of the corporation? 4. Is taxpayer entitled to depreciation of $1,128.65 for the year 1954 and a like amount for the year 1955 for depreciation on an automobile which was used by Inga Bardahl for her personal use? 5. Is taxpayer entitled to deduction of the operating expenses of $261.57 for the year 1954 and $214.39 for the year 1955 under section 162, Internal Revenue Code of 1954, of the automobile described in Issue 4 above? 6. Is taxpayer entitled to a deduction of $554.05 for the year 1954 and a deduction of $399.71 for the year 1955, these amounts being expended by the corporation for the entertainment of guests of petitioner's president, Ole Bardahl, and all the guests being business associates whose entertainment was for business reasons? 7. Is taxpayer entitled to the deduction of $103.94 for the year 1954 and the sum of $74.98 for the year 1955 for expenses *69 incurred in maintaining a business office in the residence of petitioner's president under section 162 of the 1954 Code? The issues with respect to petitioner Bardahl International Corporation are as follows: 1. Is taxpayer entitled to deduction of $1,500 for salary paid to Inga Bardahl as reasonable compensation for the fiscal year ending November 30, 1955? 2. Is taxpayer entitled to a deduction of $607.41 for the amount contributed by it to its pension and profit-sharing plan on behalf of Inga Bardahl for the fiscal year ending November 30, 1955? The issue with respect to petitioners Ole Bardahl and Inga Bardahl is as follows: Did respondent properly determine that Ole Bardahl and his wife, Inga Bardahl, received taxable community income from Bardahl Manufacturing Corporation for the year 1954 in the amount of $2,610.87 ($1,305.44 as to each individual) on account of payments by the corporation of certain items and expenses for the personal use and benefit of the individuals, officers and principal stockholders of the corporation? The cases have been consolidated. Findings of Fact Some of the facts are stipulated and are so found. Petitioners Bardahl Manufacturing Corporation (hereinafter *70 referred to as Manufacturing) and Bardahl International Corporation (hereinafter referred to as International), corporations organized under the laws of the State of Washington with pincipal places of business in Seattle, Washington, timely filed corporation income tax returns for the calendar years 1954 and 1955, and the fiscal year ending November 30, 1955, respectively, with the district director of internal revenue, Tacoma, Washington. Petitioners Ole Bardahl and Inga Bardahl, husband and wife, with residence in Seattle, timely filed individual income tax returns for 1954 with the district director of internal revenue, Tacoma. No deficiency has been determined against them for the year 1955. Ole was born in Norway, attending grade and high school there. He has taken night courses in accounting, chemistry, and other subjects in the United States. In 1921, he came to the United States as an immigrant and worked at such jobs as he could find. He became successively a successful flooring contractor and then a successful general contractor constructing mainly residences. In 1938, Ole became associated with James Tennant and another who were interested in a business developing an additive *71 to oil to produce superior lubrication. Ole made loans to these two men to develop an additive, which loans they were unable to repay. In September 1939, Manufacturing, under the name Pacific Products Corporation, was organized under the laws of the State of Washington to develop an oil additive business. The basic asset of this corporation was a formula which when added to either the crankcase oil or the gasoline of an automobile increased engine performance and reduced engine wear. These products were sold under the trade name "Bardahl." In 1948, Pacific Products Corporation changed its name to Bardahl Manufacturing Corporation. Ole and Tennant were each issued approximately 43 per cent of the stock of Manufacturing either personally or jointly with others at the time it was organized. Ole's stock was issued in cancellation of loans made by him to develop the oil additive. In 1951, Ole purchased the interest of Tennant and became the majority shareholder of Manufacturing. Ole's active participation in the oil additive business began in 1939. He purchased, designed, and engineered the first plant which was occupied until 1951, at which time the business was moved to the present *72 plant site. Ole became president of Manufacturing in 1940 and has continued as director and president of the corporation to date. Tennant was the secretary and a director of the corporation to March 3, 1951. In the early years from 1939 to 1946, the success of Manufacturing in the marketing of its additive was moderate. Neither Tennant nor Ole drew any salary from Manufacturing for the years 1939 through 1942. In the years 1943 through 1945 the salaries paid Ole and Tennant were as follows: Year
Ole
Tennant
1943
$ 600
$ 600
1944
1,050
1,050
1945
1,800
1,800
In the year 1946 a national advertising campaign was undertaken which was financed largely from loans by Ole. Prior to 1946 it was impossible to enlarge the business because of wartime shortages of raw materials which were allocated by priorities of which Manufacturing had none. In order to facilitate sales, Ole established distributorships in 1946 which began with one distributorship covering 28 states and including Central and South America also, with headquarters in St. Louis, Missouri. Other distributorships were then established covering the remainder of the United States, Canada, and Norway. These distributorships were separately owned *73 and no stock in them was owned by Manufacturing or by Ole. Each distributor operated under franchise agreement with Manufacturing and was subject to supervision with respect to product quality control, advertising, and promotion. The distributors would generally purchase a concentrated form of "Bardahl" additive which would be added to a motor oil subject to the specifications as to quality required by Manufacturing. After this blending process, the additive composed of concentrate and motor oil was canned and distributed to gas stations, garages, and subdistributors by the distributor. In nearly every case each distributor was required to construct and equip a blending plant for this purpose. An exception is the Southeast Asia area where the end product for consumer use was shipped directly from Manufacturing in Seattle rather than in a concentrated form. In 1952, Manufacturing constructed a new plant and warehouse with 16,000 square feet of floor space. Canning machinery was designed to produce a quality-controlled product as efficiently as possible. All improvements of the new plant were under Ole's direct supervision. The number of Manufacturing's products grew from two in 1939 *74 to 11 in 1955. Ole exercised resourcefulness and imagination in market analysis and personally selected the new products which Manufacturing made. In March 1953, after an extended trip by Ole to Europe, Manufacturing established distributorships in Belgium and Italy. These distributors were encouraged to expand into England, Africa, South America, India, Philippines, Hongkong, Singapore, Indonesia, and Pakistan. In 1955, a distributorship was set up for Hawaii, Japan, New Zealand, and Australia. By 1955, there were hundreds of distributorships handling Manufacturing's products in the United States and 72 foreign countries. The amount of sales (in dollars) and net income of Manufacturing in the years 1939 through 1955 were, as follows: Year
Sales
Net Income
1939
$ 188
*
1940
1,108
*
1941
2,956
*
1942
3,895
$ 317
1943
14,550
959
1944
19,228
3,948
1945
39,318
7,237
1946
68,211
13,259
1947
64,583
2,352
1948
155,321
26,454
1949
266,786
71,192
1950
404,714
107,133
1951
865,667
336,835
1952
788,516
226,492
1953
1,172,931
282,228
1954
1,400,804
571,482
1955
1,236,093
456,206
The salary paid to Ole by Manufacturing in the years 1939 through 1955, and its percentage of net corporate income for the respective years were as follows: *75 Percentage of
Year
Salary
Net Income
1939-1942
None
1943
$ 600
62.56
1944
1,050
26.59
1945
1,800
24.87
1946
3,750
28.28
1947
7,500
31.88
1948
14,400
54.43
1949
22,000
30.90
1950
40,000
37.33
1951
57,000
16.84
1952
60,000
26.49
1953
75,000
26.56
1954
75,000
13.10
1955
75,000
16.44
All major phases of Manufacturing's operations were under the direct personal supervision of Ole. The responsibility for making all decisions except those of nominal importance was his. When traveling either in the United States or abroad he kept in constant contact with Manufacturing's principal office and was frequently consulted as to matters of importance. His approval was required for all purchases costing more than a few hundred dollars. All arrangements for financing received his personal attention and required his approval. Market research was conducted under his direction and the choice of new products to be manufactured was his alone. In this he consulted and directed operations of the lubricating engineer. He made the major decisions as to the work force, the hours of plant operation, the types of machinery to be purchased for plant operation, and production methods. He constantly sought to improve the control of the quality of the products *76 and to increase the degree of automation in production. He directed sales and promotional activities; he encouraged and attracted establishment of distributorships all over the world; he personally visited the distributors, advising them, consulting with them as to the demand for existing or new products, aiding them in more firmly establishing their businesses, even to the point of traveling with distributors' salesmen to counsel them in improved sales techniques. He also performed some services as a research chemist. During the years 1953, 1954, and 1955, Manufacturing's officers were Ole, president; Inga, vice president; C. B. Merritt, secretary-treasurer. These same three people were the directors of Manufacturing. During those same years the number of Manufacturing's other employees varied between 12 and 15. In December 1954, a new corporation was started which was originally called Bardahl Oil Company of Washington, Inc.; subsequently changed to Bardahl International Corporation and hereinafter referred to as International. It was stipulated that this corporation was organized for the following reasons: (a) The management felt that the sales and manufacturing ends of the business *77 should be separated because of the already apparent international scope of business coupled with the difficult distributor relationships in an international operation. (b) There was an expected advertising acceleration which included a contract for $750,000 for advertising. Rather than jeopardize the assets of Manufacturing because of this contract, the liability was shifted to the sales organization which had relatively few assets. Neither Manufacturing nor Ole assumed any liability on this contract. (c) By separating the selling and distribution end it was felt that the executive department of the business could be more readily expanded as necessary with a clearer delineation of duties. Simpson became a vice president in charge of sales because of this in the year 1957. (d) As new products were developed it would not be necessary to include them in the present marketing setup since they would belong to the manufacturing end of the business. After organization of International, the two corporations shared offices in the same building where the plant is located. Part of the books and records of the respective corporations were kept in the same office; some were kept in separate rooms. *78 The mail all comes in together. Ole's office is headquarters for both corporations. He customarily goes over everything. A great many of the decisions pertaining to the business of the two corporations are interrelated, and it is practically impossible to separate them. Both prior to and during 1955 Ole worked long hours, sometimes 18 hours a day, in the plant, at home, or traveling. Ole devoted his entire working time to Manufacturing through the year 1954. Beginning in 1955, after the organization of International, he necessarily divided his time between the two corporations in the supervision of both the manufacturing and the sales activities. After its organization, International handled the sales and distribution of the entire production of Manufacturing. Ole traveled extensively in 1955 to major cities in the United States and Canada. He took some 15 trips and traveled an estimated 100,000 miles that year, mostly by air. Much of the travel was for International but customarily work was done for both corporations. It is practically impossible to work and travel without combining the business of the two corporations. International's net income for 1955, its first year of operation, *79 was $217,636. Manufacturing paid cash dividends during 1955 in the amount of $30,000 and a stock dividend in the amount of $125,000. Ole and members of his family owned substantially all of the stock of the two corporations. Manufacturing paid $75,000 and claimed deduction of that amount as compensation to its president, Ole, for the year 1954, which was not adjusted by respondent. The same amount was paid him and deducted by the corporation for the year 1955. In addition, International, which was newly organized in December 1954, paid Ole, its president, the amount of $37,500 as compensation for services rendered to it for the fiscal year ended November 30, 1955, which was allowed by respondent. In addition to the regular compensation paid to Ole by the two corporations for the year 1955, Manufacturing contributed on his behalf to the pension and profit-sharing plan approved by both corporations, $6,660.50, and International contributed for that purpose $2,754. Respondent disallowed $37,500 of the amount of $75,000 paid Ole by Manufacturing for the year 1955 with the following explanation: "It is held that $37,500.00 of such amount deducted represents reasonable compensation for services *80 rendered by that officer and the balance of $37,500.00 is unallowable." The amount of $75,000 paid by Manufacturing to Ole as salary in 1955 was reasonable compensation for the services he rendered to that corporation. Inga was vice president and director of Manufacturing. She was also a director of International. She owned 20 shares of stock in International which stood in the name of her husband. Inga attended the directors' meetings of the corporations, of which there were few, with her husband. The minute books of each corporation reflect one meeting of its directors in 1955, although several others were held. There were only three directors: Ole, Inga, and C. B. Merritt. Due to the fact that the stock was closely held and the businesses were essentially family corporations, much of the business was handled informally. At times Ole would take business letters and correspondence to his home in the evenings, and Inga would read them. He would solicit her ideas and they would discuss certain problems. Sometimes he would use her ideas; other times he would not. Inga performed no secretarial or accounting services for either corporation. Manufacturing paid Inga $3,000 as salary for *81 the year 1954. For 1955, Manufacturing and International each paid her $1,500 salary. Ole determined the amount paid to his wife by both corporations. In addition to the regular amounts paid to her, Manufacturing paid and took deduction for payments to the pension and profit-sharing plan on behalf of Inga for 1954 amounting to $1,225.05, and for the year 1955, $607.42. International paid and claimed as a deduction an additional amount contributed to the pension and profit-sharing plan for Inga for the year 1955 of $607.42. Respondent allowed deduction of $600 as reasonable compensation for Inga's services for each year to Manufacturing, and to International for 1955. He disallowed the balance of salaries and contributions claimed as to her. It has been stipulated that: Bardahl Manufacturing Corporation has a pension and profit sharing agreement which was qualified by the Internal Revenue Service beginning with the year ending 1953. This plan was amended to include Bardahl Oil Company of Washington, Inc., in 1955. Ole Bardahl and Inga Bardahl qualified as eligible employees under the pension and profit sharing plan in effect at Bardahl Manufacturing Corporation and Bardahl Oil Company *82 of Washington, Inc., from the plans inception. Reasonable compensation for services rendered by Inga to Manufacturing for the years 1954 and 1955 was $600 for each year; reasonable compensation for services rendered by her to International for the year 1955 was $600. Manufacturing purchased in 1954 a new Lincoln automobile costing $7,000. It was driven by Inga and used as her personal automobile during the years 1954 and 1955. She kept it at home in a garage provided for that purpose and drove it where and when she pleased. She had no other automobile. Manufacturing also had a business Cadillac which was used by Ole. The Lincoln was driven approximately 3,000 miles in each of the years 1954 and 1955. The oil was checked occasionally and the car received normal service. "Bardahl" additive was used in the oil. After the automobile had been driven 5,000 miles, Manufacturing had a mechanic dismantle the engine and several tests were made to determine if the additive assisted in seating the piston rings. Manufacturing paid $261.55 in 1954 and $214.49 in 1955 to operate the Lincoln which was used by Inga for her personal use in those years. That corporation claimed deduction for depreciation *83 on the Lincoln for each of the years 1954 and 1955 in the amount of $1,128.65 and deducted operating expenses for those years of $261.55 and $214.49, respectively, which items have been disallowed by respondent. The operating and depreciation expenses of the Lincoln automobile were not ordinary and necessary business expenses of Manufacturing. Inga and Ole entertained business associates of Ole in their home from time to time during the years 1954 and 1955. Many of these guests were from cities distant from Seattle, or from foreign countries. Guests stayed for meals, or overnight, or for periods of up to two weeks. Twice each year the corporations had large meetings of distributors, and between 40 and 60 people were entertained at the residence. On all occasions, except the two large meetings, Ole supplied the food served. Manufacturing paid Ole $1,220.65 in 1954 and $404.99 in 1955 and claimed deduction of these amounts on its return for the appropriate years as entertainment expenses. The payment by Manufacturing to Ole to the extent of $550 in 1954 and to the extent of $395 in 1955 constituted reimbursements of entertainment expenses incurred by Ole in Manufacturing's behalf and *84 were ordinary and necessary business expenses of Manufacturing. Ole had a study in his residence in which he kept his library, a collation of books of general interest containing, however, a number of books on chemistry. He also kept some files pertaining to his business in the study. On occasions, he would bring materials home from the office and work in the study. Manufacturing's office was located approximately two miles from Ole's home. No part of the cost of maintaining Ole's residence or any portion thereof was ordinary and necessary expenses of Manufacturing in 1954 or 1955. Opinion BLACK, Judge: The first issue we shall discuss is whether petitioner Bardahl Manufacturing Corporation is entitled to deduct $75,000 paid to Ole in 1955 as compensation for services he rendered as president, under the provisions of section 162(a)(1) of the 1954 Code. [2]
It has *85 been established to our satisfaction that Ole is a man of very substantial business talents and acumen. Mainly through his efforts Manufacturing grew from a marginal company with sales of $1,108 in its first full year of operation, and sales of $68,211 and net income of $13,259 six years later, until in 1955 it had sales of $1,236.093 and net income of $456,206. So far as the record discloses this outstanding growth was attributable largely to Ole's energy, constant supervision, and unique business ability. He worked long hours and his energy seems to have been equal to it. Respondent contends that because the sales activities of Manufacturing were transferred to International in December 1954, and Ole received a salary of $37,500 from International for the fiscal year ending November 30, 1955, it was unreasonable for Manufacturing to continue to pay Ole more than $37,500 in 1955. We are not impressed with the reasoning of respondent. In 1955, Manufacturing sold products for in excess of $1,200,000, and earned net income of more than $450,000. Net income was almost 37 per cent of sales. While sales, net income, and the ratio of net income to sales were higher in 1954, that was a year *86 in which both the marketing and production activities were united in Manufacturing. Sales, net income, and the ratio of net income to sales were all lower in 1953 and 1952. The combined sales and net income of Manufacturing and International for 1955 increased over those of 1954. This is not a case where no dividends were paid and where most of the earnings were paid out in salaries. For example, in 1955 Manufacturing paid $30,000 in cash dividends and paid a stock dividend of $125,000. Whether a sum constitutes reasonable compensation for services rendered to a corporation is a question of fact to be determined in the light of all relevant circumstances. A prolonged discussion of either the evidence or the precedents would, we think, serve no useful purpose. After careful consideration of all the evidence we have found that the compensation of $75,000 paid Ole in 1955 by Manufacturing was reasonable compensation for services rendered. We think the evidence fully sustains this finding of fact. We, therefore, hold in favor of petitioner, Manufacturing, on this issue. The next issue we shall discuss is whether respondent erred in disallowing deductions to Manufacturing and International *87 of all sums in excess of $600 in each taxable period as reasonable compensation to Inga. As with the previous issue relating to compensation paid by Manufacturing to Ole, the question is one of fact. The record reveals that Inga attended several meetings of the boards of directors and held the titles of vice president of Manufacturing and International. Aside from occasional business discussions with her husband at home and participation in the entertainment of business guests in their home, the record fails to disclose that Inga performed any services for either corporation. Under such circumstances, we cannot say that the presumptive correctness of respondent's determination has been overcome. We hold, therefore, that Manufacturing and International are not entitled to deduct as reasonable compensation to Inga amounts in excess of $600 per annum. As to the deductibility of contributions on Inga's behalf (this issue is not present as to payments made in Ole's behalf) to a pension and profit-sharing plan by Manufacturing in 1954 and 1955 and by International in 1955, the issue is resolved by our holding that Manufacturing and International are not entitled to deduct as reasonable compensation *88 paid to Inga in excess of $600 per annum each. Deduction of such contributions is governed by the provisions of section 404(a) of the 1954 Code. [3] *89 Section 1.404(a)-1(b) of Income Tax Regs. provides: (b) In order to be deductible under section 404(a), contributions must be expenses which would be deductible under section 162 (relating to trade or business expenses) or 212 (relating to expenses for production of income) if it were not for the provision in section 404(a) that they are deductible, if at all, only under section 404(a). Contributions may therefore be deducted under section 404(a) only to the extent that they are ordinary and necessary expenses during the taxable year in carrying on the trade or business or for the production of income and are compensation for personal services actually rendered. In no case is a deduction allowable under section 404(a) for the amount of any contribution for the benefit of an employee in excess of the amount which, together with other deductions allowed for compensation for such employee's services, constitutes a reasonable allowance for compensation for the services actually rendered. * * * We have heretofore held that any compensation to Inga in excess of $600 per annum was not deductible to each corporation because $600 per annum represented reasonable compensation for her services to the respective corporations. It follows then that the contributions to the pension and profit-sharing plan in Inga's behalf are not deductible. The next issue for our decision is whether Manufacturing is entitled to deduct depreciation and operating expenses for the Lincoln automobile which it purchased and Inga drove. Manufacturing contends that the automobile *90 was purchased to test the manner in which its products aided in the seating of the pistons of a more expensive automobile engine. It previously had run extensive tests on a less expensive automobile. Manfacturing insists that it was cheaper to turn the Lincoln automobile over to Inga to drive than to hire a driver. After a careful consideration of the evidence, we are unconvinced that the purchase and operation of the Lincoln was business motivated rather than a method by which the vice president and wife of the president and principal stockholder, who had no car of her own, was provided with a means of personal transportation. We hold, therefore, that Manufacturing is not entitled to deduct depreciation and operating expenses for the Lincoln automobile in 1954 and 1955. Cf. American Properties, Inc., 28 T.C. 1100, affd. 262 F. 2d 150. The next issue for decision is whether Manufacturing is entitled to deduct all or any portion of amounts paid Ole in 1954 and 1955 as expenses of entertainment and maintaining space in his home which was sometimes used for business. As to the claimed entertainment expenses, we are satisfied that Ole did incur costs in the entertainment of business *91 visitors in his home for the benefit of Manufacturing and that the corporation reimbursed him for these expenses. While the record is not so clear as might be desired as to the extent of these expenditures, we have exercised our best judgment and determined the allowable amounts of deductible reimbursement for entertainment expenses as $550 in 1954 and $395 in 1955. Cf. Cohan v. Commissioner, 39 F. 2d 540. As to the claimed deduction of the expenses of maintaining a study in Ole's home which he sometimes used to look over business papers and in which he kept some papers and books helpful to him in business, the record contains nothing to show that the study was not used as a personal convenience to Ole rather than as a necessity to Manufacturing. The Commissioner is sustained as to this part of his disallowance of claimed business expense to Manufacturing. The final issue in the case is with reference to Ole and Inga and is stated in their brief as follows: These petitioners are not required to include in their income the depreciation on the experimental Lincoln automobile of $1,128.65; the operating expense relative to said automobile of $261.57 with respect to said automobile and *92 expenses paid by Bardahl Manufacturing Corp. with respect to entertainment of various business guests in their own home in the amount of $1,220.65, said expenses being of no benefit economically or personally to the taxpayers under Section 262 of the Internal Revenue Code of 1954. The Commissioner, in his determination of the deficiencies against Ole and Inga for the year 1954, has determined that they had community income in 1954 of $2,610.87 which they failed to report. He has added to the income reported by each on their returns for 1954, one-half of the $2,610.87. The foregoing amount of $2,610.87 determined by the Commissioner as community income of Ole and Inga which they did not report is detailed in respondent's brief as follows: Lincoln automobile, depreciation (used
by Inga Bardahl)
$1,128.65
Lincoln automobile operating ex-
penses (used by Inga Bardahl)
261.57
Entertainment (payments by corpora-
tion to individuals for use of per-
sonal residence to entertain guests
and for part-time office)
1,220.65
Total
$2,610.87
It is clear to us that the mere fact that depreciation of $1,128.65 on the Lincoln automobile is not allowable as a deduction to Manufacturing, as we have decided, because *93 the automobile was used by Inga as her personal automobile, would not make the disallowed depreciation income to Inga. She made no attempt to take depreciation on the automobile on her return and nothing has been added to her income because of depreciation which she undertook to take and was disallowed. We think, however, that the rental value of the automobile owned by Manufacturing would be income to Inga because it was put to her personal use. With reference to the two above items of $1,128.65 and $261.57, petitioners in their brief state as follows: Taxpayers Ole and Inga Bardahl concede that if the Bardahl Manufacturing Corp. is denied its deduction for the items mentioned above that these items should correspondingly be included in their gross income. * * * We view this concession in petitioners' brief as an admission that the rental value of the Lincoln automobile in 1954 was equal to the $1,128.65 which Manufacturing deducted as depreciation on the automobile for that year and which deduction we have disallowed to Manufacturing. In view of the concession quoted above from petitioners' brief we sustain the Commissioner in his inclusion in the computation of community income *94 for 1954 of this item of $1,128.65. As to the $261.57 operating expense of the Lincoln automobile paid by Manufacturing but which was used by Inga for personal use, we sustain the Commissioner. Amounts paid by a corporation for the personal use of some facility by an officer represent income to the officer. Cf. American Properties, Inc., supra. As to the amount of $1,220.65 determined by respondent as includible income to Ole and Inga by reason of his disallowance of entertainment and home maintenance expenses paid to them by Manufacturing, our holding that $550 of the amount so paid represented reimbursement of expenses made on behalf of Manufacturing negates the contention that the amount was expended for the personal use of Ole to that extent. Therefore, that $550 does not represent community income to Ole and Inga. The Commissioner is sustained as to the balance of this item of $1,120.65. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: Inga Bardahl, Docket No. 73286; Ole Bardahl, Docket No. 73287; and Bardahl International Corporation, Docket No. 73288.↩
*. Not available.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
3. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule. - If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162↩ (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, * * *